Edward J. Blum, State Bar No. 185163
LAW OFFICE OF EDWARD J. BLUM
3700 Wilshire Blvd., Suite 950
Los Angeles, California 90010
Phone: (213) 479-5322; Fax: (323) 383-9910
Email:  edblum@duidefenseLA.com

Attorney for Sylvia Ferrara

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| SYLVIA FERRARA, an individual, | Case No.:  CV 20-3421 PSG (KSx) |
| Plaintiff, | |
| vs. | **SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL** |
| PETER T. GAYNOR,[1] Acting Secretary, United States Department of Homeland Security, a government entity, | |
| Defendant. | |

---

[1] Pursuant to Fed.R.Civ.P. 25(d) current Acting Secretary of the Department of Homeland Security Peter Gaynor is automatically substituted for former Acting Secretary of the Department of Homeland Security Chad Wolf.

## SECOND AMENDED COMPLAINT

COMES NOW, Plaintiff SYLVIA FERRARA, (hereinafter "Plaintiff"), by and through her undersigned counsel, hereby sues Defendant PETER T. GAYNOR, Acting Secretary of the United States Department of Homeland Security (hereinafter referred to as "Defendant"), and states as follows:

## NATURE OF THE ACTION

Plaintiff brings this lawsuit to remedy acts of employment discrimination perpetrated against her by Defendant in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991. Plaintiff's allegations are discussed in greater particularity in paragraphs 19 through 76 below.

## JURISDICTION

1.      This Honorable Court has jurisdiction over the subject matter of this employment discrimination action as Defendant is the head of a branch of the Federal Government, and as such, this court has jurisdiction under 28 U.S.C. § 1346.

2.      Jurisdiction over this matter is also properly invoked under 28 U.S.C. § 1331, which conveys federal question jurisdiction and specifically under 28 U.S.C. §§ 1343(3), 1343(4).

3.      This Honorable Court also has jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1337.

4.      This action is also authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e-5(f)(3) and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, which

grants jurisdiction over civil actions which seek monetary damages, equitable, and declaratory relief for violations of civil rights.

## VENUE

5.     This action properly lies in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391, in that the conduct complained of occurred within the Central District of California, and that the Defendant, as the Acting Secretary for the DEPARTMENT OF HOMELAND SECURITY ("DHS"), is the designated official responsible for the conduct of the personnel for the TRANSPORTATION SECURITY ADMINISTRATION ("TSA") at Los Angeles International Airport ("LAX"), located in the City of Los Angeles, County of Los Angeles, State of California.

6.     Venue is also proper in the Central District of California under 42 U.S.C. § 2000e-5(f)(3); as (a) Plaintiff was employed by Defendant in the Central District of California at the time of her removal from federal service; (b) Plaintiff's employment records are maintained by Defendant in the Central District of California; (c) decisions adverse to Plaintiff's employment that are the subject of this civil action were made in the Central District of California; and (d) because a substantial part of the events or omissions giving rise to this lawsuit occurred in the Central District of California.

## PARTIES

7.     At all relevant times herein, Plaintiff was a natural person *sui juris* residing within the County of Los Angeles, State of California, and at all relevant times herein, Plaintiff was employed by the DHS and TSA in the City of Los Angeles, County of Los Angeles, State of California.

SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL

8.     At all relevant times herein, Plaintiff was a "person" covered by Title VII as defined in 42 U.S.C. § 2000e(a).  At all relevant times herein, Plaintiff was an "employee" covered by Title VII as defined in 42 U.S.C. § 2000e(f).

9.     The DHS was established by the Homeland Security Act of 2002, is the third largest Cabinet department of the United States federal government, and is charged with the responsibility of protecting the territory of the United States from terrorist attacks and responding to natural disasters.  One of the agencies commanded by Defendant is the TSA, which conducts business, maintains employees, and operates as a safety and security-screening agency in this judicial district and throughout the country.  The Defendant is headquartered in Washington, D.C.

10.     Defendant is the head of the DHS and the sole Defendant in this case. See 42 U.S.C. § 2000e-16(a) and (c).  At all relevant times herein, DHS is and was an "executive agency" as provided in 5 U.S.C. § 105, and as incorporated in 42 U.S.C. § 2000e-16, is "an Executive Department, a Government corporation, or an independent establishment."

11.     The TSA, where Plaintiff worked, was transferred to the DHS pursuant to the Department of Homeland Security Act of 2002, section 424, effective March 1, 2003. Defendant therefore has the full responsibility for administration of all programs within the TSA, including the employment policies and practices of TSA in all regions and in a position to create and implement policy to eliminate and prevent any form of discrimination and retaliation and to provide complete relief for Plaintiff.  Defendant is sued in his official capacity.

12.     The TSA, as a component of DHS, is responsible for the security of all modes of transportation including aviation, rail, highways and pipelines. The vast majority of TSA's resources are dedicated to aviation, and as such, TSA oversees the passenger safety and security measures at approximately 450 of the nation's commercial airports, including airports within the Central District of California.

13.     All operational instructions and policies and procedures and discipline originate at the National Headquarters of the DHS and TSA, are transmitted to LAX, and from there, Darby LaJoye ("LaJoye"), the Federal Security Director at TSA/LAX, at all relevant times herein, had the responsibility, along with his immediate subordinates, to implement instructions, policies, procedures, and discipline.  At all relevant times herein, TSA/LAX, under color of DHS, operated and/or managed and or supervised and did maintain TSA employees, agents, and/or representatives from TSA/LAX, including, but not limited to, Deputy Federal Security Director for Security Shannon Garcia-Hamilton ("Garcia-Hamilton"),  Assistant Federal Security Director for Screening Jason Pantages ("Pantages"), Assistant Federal Security Director for Screening Brian Bondoc ("Bondoc"), Acting Deputy Federal Security Director Geoff Shearer ("Shearer"), as well as the Plaintiff.

14.     Defendant is and was conducting business within the State of California, having an office located in the County of Los Angeles, and was also Plaintiff's employer.

15.     Defendant is a person engaged in an industry affecting commerce who has fifteen (15) or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year in accordance with 42 U.S.C. § 2000e(b).

**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL**

16.     The term "employer" under the Title VII liability scheme is defined to include any agent of the DHS and TSA as stated in 42 U.S.C. § 2000e(b).  Thus, all supervisory personnel and other agents of DHS and TSA described herein (e.g., LaJoye, Garcia-Hamilton, Pantages, Bondoc, & Shearer) are themselves employers for purposes of liability.

17.     At all relevant times herein, all supervisory personnel and other agents of TSA described herein (e.g., LaJoye, Garcia-Hamilton, Pantages, Bondoc, & Shearer) were the agents, servants, or employees of Defendant, and at all times were acting within the course and scope of said agency, service, or employment.

18.     At all relevant times herein, all supervisory personnel and other agents of TSA described herein (e.g., LaJoye, Garcia-Hamilton, Pantages, Bondoc, & Shearer) acted with the knowledge, consent, and/or ratification of Defendant.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

19.     At all relevant times herein, Plaintiff's race/national origin was Hispanic (Spanish), her sex/gender was female; and her year of birth was 1968.

20.     At all relevant times herein, Plaintiff was a Transportation Security Manager ("TSM"), SV-1801, H-band; a position that did not require a college degree.

21.     On or about April 18, 2011, Plaintiff was issued a Letter of Reprimand for her alleged failure to follow instructions.  Prior to April 18, 2011, Plaintiff had no formal discipline in her official personnel file.

22.     Plaintiff felt that the Letter of Reprimand issued to her on or about April 18, 2011, was result of unlawful employment discrimination so Plaintiff sought EEO counseling and filed a formal complaint of discrimination in Agency # HS-TSA-01353-

2011, EEOC Case No. 480-2012-00428X.  Plaintiff's formal complaint of discrimination was investigated and it was ultimately settled on or about March 29, 2013.[2]  LaJoye was a signatory for the Agency on the settlement agreement.  Prior to March 29, 2013, Plaintiff had absolutely no role in deciding the terms of the settlement agreement and Plaintiff was not asked to add or change any of the terms contained in the settlement agreement.

23.     LaJoye, Garcia-Hamilton, Pantages, Bondoc, and Shearer, each had knowledge of Plaintiff's participation in Agency # HS-TSA-01353-2011, EEOC Case No. 480-2012-00428X, and Plaintiff's subsequent settlement of it on or about March 29, 2013.

24.     Immediately after settling her EEO case on or about March 29, 2013, Defendant retaliated against Plaintiff by initiating at least six (6) retaliatory adverse employment actions against her.

25.     On or about April 30, 2013, Plaintiff was issued a *Notice of Decision on Proposed Fourteen (14) Calendar Day Suspension* issued by Shearer.  In the *Notice of Decision on Proposed Fourteen (14) Calendar Day Suspension*, Shearer effectively suspended Plaintiff for ten (10) calendar days for inappropriate conduct.  Plaintiff did not seek EEO counseling for the April 30, 2013 suspension and it is therefore untimely. Plaintiff includes the facts regarding the *Notice of Decision on Proposed Fourteen (14) Calendar Day Suspension* issued by Shearer on or about April 30, 2013, solely as "background" evidence of present, actionable retaliation.  While the time-barred *Notice*

---

[2] The Settlement Agreement & Release is dated March 25, 2013 and the effective date was March 29, 2013.

**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL**

*of Decision on Proposed Fourteen (14) Calendar Day Suspension* issued to Plaintiff on or about April 30, 2013 is not actionable in and of itself, the *Notice of Decision on Proposed Fourteen (14) Calendar Day Suspension* issued to Plaintiff on or about April 30, 2013 is relevant as indirect proof of Defendant's intent to retaliate against Plaintiff for settling her EEO case on or about March 29, 2013.  The *Notice of Decision on Proposed Fourteen (14) Calendar Day Suspension* issued to Plaintiff on or about April 30, 2013 is also relevant for its probative value in assessing whether Defendant's justifications for the timely adverse employment actions lack credibility.  The *Notice of Decision on Proposed Fourteen (14) Calendar Day Suspension* issued to Plaintiff on or about April 30, 2013 also suggests that Defendant may have had a retaliatory motive that led to Plaintiff's subsequent adverse employment actions that were timely filed.

26.     On or about May 1, 2013, Pantages issued Plaintiff a *Notice of Proposed Removal* for her alleged lack of candor and failure to properly designate employee representation.

27.     On June 3, 2013, LaJoye placed Plaintiff on administrative leave.  As a result of being placed on administrative leave, Plaintiff had to return to Garcia-Hamilton any and all identification badges, equipment, credit cards, keys, etc.  Plaintiff also could not access TSA offices or any other TSA facilities.  Plaintiff did not seek EEO counseling for her placement on administrative leave on June 3, 2013 and it is therefore untimely.  Plaintiff includes the facts regarding LaJoye placing Plaintiff on administrative leave on June 3, 2013, solely as "background" evidence of present, actionable retaliation.  While being placed on administrative leave on June 3, 2013 is not actionable in and of itself, the placement of Plaintiff on administrative leave on or about

June 3, 2013 is relevant as indirect proof of Defendant's intent to retaliate against Plaintiff for settling her EEO case on or about March 29, 2013.  The placement of Plaintiff on administrative leave on or about June 3, 2013 is also relevant for its probative value in assessing whether Defendant's justifications for the timely adverse employment actions lack credibility.  The placement of Plaintiff on administrative leave on or about June 3, 2013 also suggests that Defendant may have had a retaliatory motive that led to Plaintiff's subsequent adverse employment actions that were timely filed.

28.     On or about June 6, 2013, Plaintiff provided an oral reply to the *Notice of Proposed Removal* issued to her on or about May 1, 2013.  In the oral reply, Plaintiff vehemently disputed the two (2) charges against her.

29.     On June 18, 2013, Plaintiff was summoned to a meeting with Garcia-Hamilton.  At the beginning of the meeting, Garcia-Hamilton issued a *Notice of Decision on Proposed Removal* to Plaintiff, which upheld the *Notice of Proposed Removal* issued to Plaintiff on or about May 1, 2013.   As an alternative to removal, however, Garcia-Hamilton immediately offered Plaintiff a Last Chance/Abeyance Agreement on June 18, 2013.  Defendant knew that Plaintiff was in an unequal bargaining position and would be required to sign the agreement in order to remain employed with Defendant.

30.     When Garcia-Hamilton gave the Last Chance/Abeyance Agreement to Plaintiff, Plaintiff asked Garcia-Hamilton if she could take the Last Chance/ Abeyance Agreement home with her so that she could carefully review it.  Garcia-Hamilton told Plaintiff that she could not take the Last Chance/Abeyance Agreement home with her to review.

SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL

31.     Plaintiff next asked Garcia-Hamilton if she could have her attorney review the Last Chance/Abeyance Agreement.  Garcia-Hamilton told Plaintiff that she could not have her attorney review the Last Chance/Abeyance Agreement before she signed it.

32.     After Garcia-Hamilton rejected Plaintiff's requests to take the Last Chance/Abeyance Agreement home to review it and to allow her attorney to review it, Plaintiff began to read the Last Chance/Abeyance Agreement.  Garcia-Hamilton immediately stated, hurry up, we do not have all day for this."  Garcia-Hamilton also told Plaintiff, "either you want to remain employed with TSA or you do not.  It is as simple as that." Plaintiff began asking Garcia-Hamilton questions about the specific provisions contained in the Last Chance/Abeyance Agreement that Plaintiff felt were unclear and/or ambiguous.

33.     Plaintiff asked Garcia-Hamilton about paragraph 9 of the Last Chance/Abeyance Agreement.  Specifically, Plaintiff asked Garcia-Hamilton if the text contained in paragraph 9 only applied to the removal action issued on June 18, 2013.  Garcia-Hamilton said, "yes.  Paragraph 9 only applies to the removal action issued on June 18, 2013."  Plaintiff asked Garcia-Hamilton if she was sure about her understanding of paragraph 9 because she did not want to waive her ability to commence a civil rights action in the future in the event that she was discriminated against in the future. Garcia-Hamilton was adamant that paragraph 9 only applied to the removal action issued to Plaintiff on June 18, 2013.

34.     Plaintiff also asked Garcia-Hamilton about paragraph 11 of the Last Chance/Abeyance Agreement.  Specifically, Plaintiff asked Garcia-Hamilton if the text contained in paragraph 11 only applied to the removal action issued on June 18, 2013?

Garcia-Hamilton said, "yes. Paragraph 11 only applies to the removal action issued on June 18, 2013."

35.     Plaintiff also asked Garcia-Hamilton about paragraph 8 of the Last Chance/ Abeyance Agreement.  Specifically, Plaintiff asked Garcia-Hamilton why the text contained in paragraph 8 appeared to be inconsistent with paragraphs 9 & 11. Garcia-Hamilton responded, "paragraphs 9 & 11 are not inconsistent with paragraph 8."

36.     Plaintiff also asked Garcia-Hamilton about paragraph 13 of the Last Chance/ Abeyance Agreement.  Specifically, Plaintiff asked Garcia-Hamilton if paragraph 13 allowed her to file an Equal Employment Opportunity ("EEO") claim if she was discriminated against by TSA in the future.  Garcia-Hamilton stated that paragraph 13 allows Plaintiff to file an EEO action so long as it was not related to the removal action issued to her on June 18, 2013.

37.     Despite Garcia-Hamilton's responses to her questions, Plaintiff told Garcia-Hamilton that she would feel more comfortable if paragraphs 8, 9, & 11 were removed from the Last Chance/Abeyance Agreement because paragraphs 8, 9, & 11 were not clear to her and that it appeared to her that paragraphs 8, 9, & 11 contradicted each other.  Garcia-Hamilton told Plaintiff that none of the paragraphs would be removed from the Last Chance/Abeyance Agreement, even if Plaintiff did not understand paragraphs 8, 9, & 11 in the Last Chance/Abeyance Agreement or if paragraphs 8, 9, & 11 were contradictory.

38.     Plaintiff asked Garcia-Hamilton whether many of the words contained in the Last Chance/Abeyance Agreement were defined somewhere because she did not understand many of them.  Garcia-Hamilton told Plaintiff that, "you are on your own.  If

you do not understand a specific word, you would have to look it up in a dictionary."
When Plaintiff asked Garcia-Hamilton if she had a dictionary for her to use, Garcia-
Hamilton said, "no.  I said you are on your own."

39.     Before Plaintiff was able to read the entire Last Chance/Abeyance
Agreement, Garcia-Hamilton said, "we have to wrap this up.  Sign the Last
Chance/Abeyance Agreement!"

40.     Plaintiff reminded Garcia-Hamilton again that she wanted to have her
attorney view the Last Chance/Abeyance Agreement before she signed it.  Garcia-
Hamilton again denied Plaintiff's request and stated that "if you don't sign the Last
Chance/Abeyance Agreement now, you will be removed from federal service today."  At
that point, Plaintiff signed the Last Chance/Abeyance Agreement on June 18, 2013.

41.     Plaintiff had absolutely no role in deciding the terms of the Last
Chance/Abeyance Agreement and Plaintiff was not asked if she wanted to add or
change any of the terms contained in the Last Chance/Abeyance Agreement.  Plaintiff
also feels that she was coerced into signing the Last Chance/Abeyance Agreement at
the threat of an undeserved employment action (i.e., removal from federal service).
Plaintiff simply did not agree with the *Notice of Decision on Proposed Removal* that was
issued to her on June 18, 2013.

42.     On or about July 8, 2013, Garcia-Hamilton ordered that complete SPOT
Standard Operating Procedures ("SPOT SOP") be distributed to and stored at all
checkpoints at LAX.[3]  This order by Garcia-Hamilton was a violation of the SPOT SOP
because the SPOT SOP does not permit the SPOT SOPs to be distributed to or stored

---

[3] The SPOT SOP is sometimes referred to as "BDO SOP."

**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL**

at the screening checkpoint locations and it does not allow the SPOT SOP to be made available to those who do not have a need to know.  LaJoye did not authorize Garcia-Hamilton to order the complete SPOT SOP to be distributed to or stored at the screening checkpoint locations at LAX.  LaJoye also did not authorize Garcia-Hamilton to authorize the SPOT SOP to be made available to checkpoint personnel at LAX who did not have a need to know the contents thereof.

43.     On or about July 8, 2013, Security Training Instructor ("STI") Ruth Bukowski ("Bukowski") distributed the SPOT SOPs to all of the checkpoints at LAX as directed by Garcia-Hamilton.  Transportation Security Manager ("TSM") Brandi Richards ("Richards") received the SPOT SOPs for Terminal 1 & 2 from Bukowski on July 8, 2013.  After receiving the SPOT SOPs for Terminal 1 & 2 from Bukowski, Richards signed the *Signature of Receipt for SOP Distribution* acknowledging receipt of the SPOT SOPs.[4]  TSM Alexander Cardona ("Cardona") received the SPOT SOP for Terminal 3 from Bukowski on July 8, 2013.  After receiving the SPOT SOP for Terminal 3 from Bukowski, Cardona signed the *Signature of Receipt for SOP Distribution* acknowledging receipt of the SPOT SOP.  TSM Cheri Martorana ("Martorana") received the SPOT SOP for Terminal 4 from Bukowski on July 8, 2013.  After receiving the SPOT SOP for Terminal 4 from Bukowski, Martorana signed the *Signature of Receipt for SOP Distribution* acknowledging receipt of the SPOT SOP.  TSM Kim Purvis ("Purvis") received the SPOT SOP for Terminal 5 from Bukowski on July 8, 2013.  After receiving

---

[4] When Richards signed for SPOT SOPs on the *Signature of Receipt for SOP Distribution* form, she certified, inter alia, that she accepted responsibility for the SPOT SOPs, that she was responsible for using appropriate Sensitive Security Information ("SSI") procedures to secure the received SPOT SOPs or SPOT SOP updates . . ., and that she took full responsibility for all contents of the received SPOT SOPs.

**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL**

the SPOT SOP for Terminal 5 from Bukowski, Purvis signed the *Signature of Receipt for SOP Distribution* acknowledging receipt of the SPOT SOP.  TSM Douglas Cruz ("Cruz") received the SPOT SOP for Terminal 6 from Bukowski on July 8, 2013.  After receiving the SPOT SOP for Terminal 6 from Bukowski, Cruz signed the *Signature of Receipt for SOP Distribution* acknowledging receipt of the SPOT SOP.  TSM Randy Walker ("Walker") received the SPOT SOP for Terminal 7 from Bukowski on July 8, 2013.  After receiving the SPOT SOP for Terminal 7 from Bukowski, Walker signed the *Signature of Receipt for SOP Distribution* acknowledging receipt of the SPOT SOP. TSM Moises Hernandez ("Hernandez") received the SPOT SOP for Tom Bradley International Terminal ("TBIT") from Bukowski on July 8, 2013.  After receiving the SPOT SOP for TBIT from Bukowski, Hernandez signed the *Signature of Receipt for SOP Distribution* acknowledging receipt of the SPOT SOP.  Because Richards signed for the SPOT SOPs for Terminals 1 & 2, it was her responsibility to place the binders in the SSI cabinet in both Terminals 1 & 2 and to add the binder into the system in Terminals 1 & 2.  Instead of securing the SPOT SOPs in Terminal 1, Richards sent Transportation Security Officer ("TSO") Frank Segbefia ("Segbefia") to Terminal 1 to deliver the SPOT SOP to Plaintiff in Terminal 1.

44.     On or about July 8, 2013, Segbefia handed Plaintiff a binder while she was sitting at the podium in Terminal 1.  Segbefia only told Plaintiff that the binder was for the supervisor.  Plaintiff cursorily flipped through the binder but did not notice what the binder was or what it contained.  Plaintiff then placed the binder to the left of her on the desk where the supervisors normally sit.  At no time did Plaintiff recognize the binder to be a SPOT SOP nor was she told by Segbefia that the binder was for her to

secure.  Plaintiff also did not receive a call from Richards providing notice that she was sending a SPOT SOP to her.  Plaintiff did not possess the SPOT SOP at any other time on July 8, 2013 or on any other date after July 8, 2013.  Later, on or about July 8, 2013, and unbeknownst to Plaintiff, Supervisory Transportation Security Officer ("STSO") Dedric Scott ("Scott") took possession of the SPOT SOP from the podium.  When Scott acquired possession of the SPOT SOP, it was Scott's responsibility to secure the SPOT SOP in the SSI cabinet and to add the binder into the system at Terminal 1.  On July 8, 2013, Scott is the last person that had possession of the SPOT SOP.  There is no evidence that anyone other than Scott took possession of the SPOT SOP after Scott took possession of it on July 8, 2013.

45.     On July 10, 2013, while reviewing the SPOT SOP at approximately 0630, Deputy Assistant Federal Security Director for Screening Christine Pope ("Pope") discovered a section in the SPOT SOP that clearly and unambiguously stated that complete SPOT SOPs shall not be stored at the screening checkpoint locations.  At approximately 0700, Pope instructed SPOT Transportation Security Manager Charlie Chelette ("Chelette") to retrieve the SPOT SOPs from all checkpoint screening locations at LAX.

46.     On July 10, 2013, at approximately 0708 hours, Chelette started his search for SPOT SOPs in Terminal 1 and discovered that the SPOT SOP assigned to Terminal 1 was nowhere to be found.  Soon thereafter, Chelette reported to Pope that the SPOT SOP assigned to Terminal 1 was nowhere to be found.

47.     On July 10, 2013, at approximately 0840 hours, Chelette delivered the SPOT SOPs from Terminals 2, 3, 5, 6, and TBIT, to Greg Vahradyan in the Training

Department.[5]  At that time, Chelette was informed that Terminal 1 was issued a SPOT SOP on Monday July 8, 2013 but it was signed for by Richards in Terminal 2.

48.     On July 10, 2013, at approximately 1000 hours, Chelette returned to Terminal 1 and spoke to the on-duty STSOs to see if they could assist him in locating the SPOT SOP that was assigned to Terminal 1.

49.     On July 10, 2013, at approximately 1030 hours, Chelette notified Pope that the SPOT SOP assigned to Terminal 1 was still missing.  Chelette also informed Pope that Richards said she gave the SPOT SOPs to Segbefia to deliver to Terminal 1.

50.     On July 10, 2013, at approximately 1045 hours, Pope went to the Terminal 1 Checkpoint to attempt to locate the SPOT SOP that was assigned to Terminal 1.  All possible locations in Terminal 1 were searched by Pope and others, along with the Behavioral Detection Officers ("BDOs") offices.  All BDO officers and managers assigned to Terminal 1 who were on duty the night before were contacted to see if they recall seeing or checking out the SPOT SOP from the Terminal 1 checkpoint screening location.

51.     On July 10, 2013, at approximately 1217 hours, Pope contacted Bondoc and reported that the SPOT SOP assigned to Terminal 1 was missing.

52.      On July 10, 2013, sometime after 1217 hours, Bondoc called Garcia-Hamilton and told her that the SPOT SOP for Terminal 1 was missing.  Bondoc also told Garcia-Hamilton that Segbefia delivered the SPOT SOP binder to Terminal 1 on July 8, 2013, and on July 10, 2013, Bondoc was unable to locate it.

---

[5] The SPOT SOPs that were assigned to Terminals 4 and 7 were allowed to remain in Terminals 4 & 7.

**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL**

53.     On July 10, 2013, after being informed that the SPOT SOP was missing, Plaintiff spoke to several supervisors regarding the location of the SPOT SOP.  When Plaintiff spoke to Scott, he informed her that he recalled putting the SPOT SOP in the SSI cabinet midway during his shift on Monday July 8, 2013.  Scott informed Plaintiff that he noticed the SPOT SOP sitting on the podium and secured it in the SSI cabinet.

54.     On or about July 11, 2013, Garcia-Hamilton reinstated the removal action that was issued to Plaintiff on or about June 18, 2013.  Plaintiff was effectively removed from federal service on or about July 11, 2013.

55.     Plaintiff would not have been removed from federal service on or about July 11, 2013, had Garcia-Hamilton not violated the SPOT SOP on July 8, 2013, when she ordered/directed that the SPOT SOPs be distributed to and stored at all screening checkpoints at LAX.

56.     No corrective, disciplinary, or adverse action was taken against Garcia-Hamilton for ordering that complete SPOT SOPs be delivered to and stored at all screening checkpoint locations at LAX on or about July 8, 2013.

57.     No corrective, disciplinary, or adverse action was taken against Richards for her involvement in and/or handling of the Terminal 1 SPOT SOP on or about July 8, 2013 or thereafter.

58.     No corrective, disciplinary, or adverse action was taken against Scott for his involvement in and/or handling of the Terminal 1 SPOT SOP on or about July 8, 2013 or thereafter.

SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL

59.     No corrective, disciplinary, or adverse action was taken against <u>Bukowski</u> for her involvement in and/or handling of the Terminal 1 SPOT SOP on or about July 8, 2013 or thereafter.

60.     No corrective, disciplinary, or adverse action was taken against <u>Segbefia</u> for his involvement in and/or handling of the Terminal 1 SPOT SOP on or about July 8, 2013 or thereafter.

61.     Plaintiff exhausted her administrative remedies for the following three (3) discrete retaliatory adverse employment actions: (a) Plaintiff's removal from federal service on or about June 18, 2013 (See Paragraph 29 above); (b) the issuance of the Last Chance/Abeyance Agreement to Plaintiff on or about June 18, 2013 (See Paragraph 29 above); (c) Defendant did not remove paragraphs 8, 9, and 11 from the Last Chance/Abeyance Agreement (See Paragraph 37 above), and (d) the removal action that was reinstated against Plaintiff on or about July 11, 2013 (See Paragraph 54 above).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

62.     As indicated in paragraphs 63 through 76 below, Plaintiff has met all procedural requirements for filing the Complaint and First Amended Complaint.

63.     Plaintiff first requested EEO counseling in this matter on or about July 29, 2013, which was within 45 days of <u>discovering</u> the employment discrimination as alleged on or about June 18, 2013 and July 11, 2013.

64.     On or about August 28, 2013, Defendant informed Plaintiff of the conclusion of the EEO counseling process and provided Plaintiff a Notice of Right to File a Formal Complaint of Discrimination.

65.    Plaintiff received the Notice of Right to File a Formal Complaint of Discrimination on or about November 4, 2013.

66.    On or about November 5, 2013, Plaintiff submitted a formal charge of Discrimination to Defendant, which was within fifteen (15) days of receipt of the *Notice of Right to File a Formal Complaint of Discrimination* on November 4, 2013.  Defendant acknowledged receipt of the formal complaint on or about November 8, 2013.  In her formal complaint, Plaintiff alleged that as a Transportation Security Manager she was discriminated against based on race (Hispanic), sex (female), age (YOB: 1968), and reprisal (unspecified prior EEO activity) when:

1.    On or about June 18, 2013, you were removed from federal service;

2.    On or about June 18, 2013, you were issued a Removal-Last Chance/Abeyance Agreement, and

3.    On or about July 11, 2013, TSA decided that you did not comply with the terms of the Removal-Last Chance/Abeyance Agreement; the removal action was reinstated, and you were terminated."

67.    On or about December 11, 2013, Defendant accepted the following claim for investigation:

"You, a Transportation Security Manager, at the Los Angeles International Airport, California, allege you were discriminated against based on race (Hispanic), sex (female), age (YOB: 1968), and reprisal (unspecified prior EEO activity) when on or about July 11, 2013, TSA decided that you did not comply with the terms of the Removal-Last Chance/Abeyance Agreement; the removal action was reinstated, and you were terminated."

68.    Defendant investigated Plaintiff's claim between on or about January 2014 through March 2014.  At the conclusion of the investigation, Defendant provided Plaintiff with a copy of the Report of Investigation ("ROI") and notice of his right to request a

SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL

- 19

hearing before an EEOC Administrative Judge ("AJ") or, alternatively, to request a Final Agency Decision.

69.     Plaintiff requested a hearing before an AJ and on or about February 7, 2015.

70.     On or about August 21, 2018, Plaintiff requested to withdraw her request for an administrative hearing and instead requested a final agency decision.

71.     On or about August 22, 2018, the AJ from the EEOC's St. Louis District Office dismissed the administrative complaint from the EEOC hearing process and remanded it to Defendant for a final agency decision.

72.     On or about October 26, 2018, pursuant to 29 C.F.R § 1614.110, Defendant took final action on Plaintiff's complaint by issuing a final agency decision. Defendant served his final agency decision by email on October 26, 2018.  Plaintiff received Defendant's final agency decision on or about October 26, 2018.

73.     On or about November 21, 2018, Plaintiff timely filed a Notice of Appeal of Defendant's final agency decision with the Office of Federal Operations ("OFO").

74.     On or about April 26, 2019, the OFO affirmed Defendant's final agency decision.  Plaintiff received the OFO decision on or about May 1, 2019.

75.     On or about May 31, 2019, Plaintiff requested reconsideration of the OFO decision.

76.     On or about January 7, 2020, the OFO issued its *Decision on Request for Reconsideration* denying Plaintiff's request.  Plaintiff received the OFO's *Decision on Request for Reconsideration* on or about January 12, 2020, therefore, Plaintiff has

**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL**

brought this action within the time limits established in 42 U.S.C. § 2000e-16(c).

Accordingly, Plaintiff has exhausted her administrative remedies.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended)**

77.     Paragraphs 1 through 76 above are hereby incorporated by reference as though fully set forth in this claim for relief.

78.      Title VII prohibit employers from discriminating against any of their employees because such employees have opposed any practice made an unlawful employment practice by Title VII, or because an employee has made a charge or participated in any manner in an investigation, proceeding or hearing under Title VII. 42 U.S.C. § 2000e-3(a).

79.     The acts, policies and practices of Defendant, as alleged above, violate Title VII's retaliation provisions described above.

80.     Garcia-Hamilton willfully and intentionally discriminated against Plaintiff, as alleged hereinabove, on the basis of reprisal for her complaints about, and opposition to, Defendant's discrimination against Plaintiff on the basis of her race/national origin, color, sex, and reprisal in EEOC Case No. 480-2012-00428X, Agency No. HS-TSA-01353-2011, that settled on or about March 29, 2013.  Specifically, on or about March 29, 2013, Plaintiff engaged in protected activity when she settled her EEO case (EEOC Case No. 480-2012-00428X, Agency No. HS-TSA-01353-2011).

81.    Garcia-Hamilton had knowledge of both Plaintiff's participation in the EEO case (EEOC Case No. 480-2012-00428X, Agency No. HS-TSA-01353-2011), and her subsequent settlement of it on or about March 29, 2013.

82.    For the purpose of this Second Amended Complaint, Plaintiff was subject to the following four (4) enforceable retaliatory adverse employment actions after she settled her EEO case (EEOC Case No. 480-2012-00428X, Agency No. HS-TSA-01353-2011) on or about March 29, 2013:  (a) Garcia-Hamilton removed Plaintiff from federal service on or about June 18, 2013; (b) Garcia-Hamilton issued a Last Chance/Abeyance Agreement to Plaintiff on or about June 18, 2013; (c) Garcia-Hamilton forced Plaintiff to agree to the terms of the Last Chance/Abeyance Agreement, including paragraphs 8, 9, and 11 that are facially retaliatory, in order to remain employed by Defendant; and (d) on or about July 11, 2013, Garcia-Hamilton reinstated the removal action that was issued to Plaintiff on or about June 18, 2013.

83.    The *Notice of Decision on Proposed Removal* as described in paragraph 29 above, was motivated by and causally related to Plaintiff's protected activities as alleged in paragraphs 22 & 80 above.  In other words, Garcia-Hamilton had knowledge that Plaintiff engaged in protected activity (e.g., Plaintiff's settlement of her EEO complaint on or about March 29, 2013) and her knowledge was in proximity in time between Plaintiff's protected activity on March 29, 2013, and Garcia-Hamilton's retaliatory employment decision (e.g., Plaintiff's removal from federal service on or about June 18, 2013).

84.    The Last Chance/Abeyance Agreement as described in paragraph 29 above, was motivated by and causally related to Plaintiff's protected activities as alleged

in paragraphs 22 & 80 above.  In other words, Garcia-Hamilton had knowledge that Plaintiff engaged in protected activities (e.g., Plaintiff's settlement of her EEO complaint on or about March 29, 2013) and said knowledge was in proximity in time between Plaintiff's protected activity on March 29, 2013, and Garcia-Hamilton's retaliatory employment decision (e.g., issuance of the Last Chance/Abeyance Agreement on or about June 18, 2013).

85.    The Last Chance/Abeyance Agreement as described in paragraph 29 above, was motivated by and causally related to Plaintiff's protected activities as alleged in paragraphs 22 & 80 above.  In other words, Garcia-Hamilton had knowledge that Plaintiff engaged in protected activities (e.g., Plaintiff's settlement of her EEO complaint on or about March 29, 2013) and said knowledge was in proximity in time between Plaintiff's protected activity on March 29, 2013, and Garcia-Hamilton's retaliatory employment decision (e.g., to not remove paragraphs 8, 9, and 11 from the Last Chance/Abeyance Agreement on or about June 18, 2013).

86.    The reinstatement of Plaintiff's removal action as alleged in paragraph 54 above, was motivated by and causally related to Plaintiff's protected activities as alleged in paragraphs 22 & 80 above.  In other words, Garcia-Hamilton had knowledge that Plaintiff engaged in protected activities (e.g. Plaintiff's settlement of her EEO complaint on or about March 29, 2013) and said knowledge was in proximity in time between Plaintiff's protected activity and Garcia-Hamilton's retaliatory employment decision (e.g. The reinstatement of Plaintiff's removal from federal service on or about July 11, 2013).

87.    Defendant had no legitimate nondiscriminatory reason for Garcia-Hamilton's retaliatory conduct on June 18, 2013 and July 11, 2013.  Any stated reasons

for Garcia-Hamilton's conduct on June 18, 2013 and July 11, 2013 are not the true reasons, but instead are a pretext to hide Defendant's retaliatory animus.

88.     Garcia-Hamilton's retaliatory conduct was done intentionally to discourage Plaintiff and others like her from engaging in EEO activity and/or would dissuade reasonable employees like Plaintiff from engaging in protected activity.

89.     As a proximate result of Garcia-Hamilton's retaliation against Plaintiff, Plaintiff has suffered and continues to suffer substantial losses and has suffered and continues to suffer job loss, lost wages, embarrassment, emotional distress, humiliation and mental anguish, all to her damage in an amount according to proof.

90.     The effect of the retaliation complained of herein has been to deprive Plaintiff of equal employment opportunities afforded to her under federal law.

91.     The unlawful employment practices were intentional, done with malice or with reckless indifference to Plaintiff's federally protected rights.

92.     By reason of Defendant's discrimination and retaliation, Plaintiff is entitled to all legal and equitable remedies available under 42 U.S.C. §2000e et. seq.

## SECOND CLAIM FOR RELIEF
### (Anticipatory or Preemptive Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended)

93.     Paragraphs 1 through 92 above are hereby incorporated by reference as though fully set forth in this claim for relief.

94.     Plaintiff engaged in protected activity as alleged in paragraphs 22 & 80 above.

95.     On or about June 18, 2013, Garcia-Hamilton conditioned Plaintiff's continued employment on her agreeing to enter into a Last Chance/Abeyance

SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL

Agreement that included an extensive series of releases and waivers that would insulate Defendant from any effort by Plaintiff to file charges with the EEOC or to seek recovery for future discrimination under Title VII.

96.     Paragraphs 8, 9, and 11 of the Last Chance/Abeyance Agreement were facially retaliatory.

97.     Paragraph 9 of the Last Chance/Abeyance Agreement is facially retaliatory as follows:  "In the event the removal action is reinstated, Ms. Ferrara agrees to waive any and all appeal or grievance rights related to the actions or decision taken by the TSA that occurred prior to the signing of this Agreement. This includes, but is not limited to the Merit Systems Protection Board (MSPB), any grievance under the Agency grievance procedure, any appropriate and applicable administrative proceeding, a civil action in any State or Federal court, or a complaint of discrimination, harassment, or retaliation pursuant to any applicable Equal Employment Opportunity complaint procedure." (Emphasis added.)

98.     Paragraph 11 of the Last Chance/Abeyance Agreement is facially retaliatory as follows: "Ms. Ferrara agrees that she will not initiate any further administrative or legal action against TSA or its employees regarding this matter, including, but not limited to, filing an EEO complaint or a complaint with the Office of Special Counsel, a grievance under the Agency grievance procedure, or civil action in any state or Federal court. This provision also results in the withdrawal and cancellation of all complaints, grievances, and/or appeals, if any, that have been previously filed concerning this matter and that may be pending in any forum." (Emphasis added.)

99.     Paragraph 8 of the Last Chance/Abeyance Agreement were facially retaliatory as follows: "<u>. . .  if the Notice of Decision on Proposed Removal is reinstated, Ms. Ferrara acknowledges that a waiver of her rights as articulated in paragraph 11 below will apply</u>."

100.    Garcia-Hamilton's act of requiring Plaintiff to sign the Last Chance/Abeyance Agreement on June 18, 2013 that included paragraphs 8, 9, and 11 above, as a condition of continued employment, was an adverse employment action.

101.    As alleged above, Garcia-Hamilton deprived Plaintiff of her right to engaged in future protected EEO activity.  The deprivation, made explicitly made clear by the terms of paragraphs 8, 9, and 11 of the Last Chance/Abeyance Agreement, "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

102.    Garcia-Hamilton feared protected activity from Plaintiff if she was removed from federal service and therefore required agreement to paragraphs 8, 9, and 11 of the Last Chance/Abeyance Agreement which required Plaintiff to give up her civil rights as an alternative to removal from federal service.  On July 11, 2013, Garcia-Hamilton used the Last Chance/Abeyance Agreement as both a sword and a shield, and reinstated the removal action imposed on June 18, 2013.

103.    As alleged above, the adverse employment action by Defendant was Garcia-Hamilton's forcing Plaintiff to agree to the terms of the Last Chance/Abeyance Agreement in order to remain employed by Defendant.

104.    As alleged above, there was a causal connection between the protected

activity causally related to Plaintiff's protected activities as alleged in paragraphs 22 &

80 above.

### THIRD CLAIM FOR RELIEF
**(Retaliation-Based Hostile Work Environment in Violation of Title VII of the Civil
Rights Act of 1964, as amended)**

105.    Paragraphs 1 through 104 above are hereby incorporated by reference as

though fully set forth in this claim for relief.

106.    After settling her EEO complaint on or about March 29, 2013, Plaintiff was

subjected to continual harassment up to the day she was terminated on or about July

11, 2013.

107.    Garcia-Hamilton was aware of Plaintiff's protected activity at all relevant

times herein.

108.    Garcia-Hamilton's conduct as alleged above created an environment that

was hostile and constitutes retaliation against the Plaintiff because she engaged in

protected activities. The  stated reasons for the Garcia-Hamilton's conduct were not the

true reasons, but instead were pretext to hide the Garcia-Hamilton's retaliatory animus.

109.    The harassment is in this case was 'sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working

environment," because Plaintiff was subject to a barrage of unjust employment actions

within a relatively short period of time of her protected activity that ultimately led to her

removal from federal service.

110.    That as a further direct and proximate result of Defendant's unlawful

employment practices, namely retaliation, Plaintiff has suffered the indignity of

retaliation for seeking to protect her rights under the law, the invasion of her right to be free from retaliation for her protected activity and great humiliation which is manifested in emotional distress at her mistreatment.

## FOURTH CLAIM FOR RELIEF
### (Unlawful Discrimination Based on Race/Disparate Treatment)

111.    Paragraphs 1 through 76 above are hereby incorporated by reference as though fully set forth in this claim for relief.

112.    At all relevant times herein, Plaintiff's race was Hispanic (Spanish); a class protected by law.  Defendant treated Plaintiff differently than similarly situated individuals outside the Plaintiff's protected class because of her membership in the aforementioned protected class. In other words, Defendant did not propose or take corrective, disciplinary, or adverse action was taken against other, non-Hispanic (Spanish) employees who engaged in conduct similar to her own—such as the improper storing of the SPOT SOPs at screening checkpoint locations and the failure to ensure the SPOT SOP was properly secured in a locked desk or file cabinet and protected from unauthorized access on or about July 8, 2013.

113.    Title VII of the Civil Rights of 1964, as amended, makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII of the Civil Rights of 1964, as amended, also adds that ". . . an unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

114.    Defendant through its officers, agents, and/or employees acting within the scope of their employment, discriminated against Plaintiff on the basis of her race (i.e., Hispanic (Spanish) in violation of 42 U.S.C.A. § 2000e-2(a)(1) by engaging in a course of conduct which included, but is not limited to, at least some of the acts set forth above.

115.    At all relevant times herein, Plaintiff was undeniably qualified for the TSM position because she was hired by Defendant on or about June 20, 2010. Plaintiff satisfactorily performed the duties of a TSM without limitation or restriction from in or about October 2002 until on or about July 11, 2013, and she was fully capable of performing the essential duties of a TSM from in or about October 2002 until on or about July 11, 2013.  Additionally, since Plaintiff began her employment with Defendant in or about October 2002, she has continually met Defendant's legitimate performance expectations each fiscal year because she always received at least an "Achieved Standards" rating on all of his performance evaluations.

116.    Plaintiff was subject to the following four (4) enforceable adverse employment actions: (a) the issuance of the *Notice of Decision on Proposed Removal* on or about June 18, 2013; (b) the issuance of the Last Chance/Abeyance Agreement on or about June 18, 2013; (c) Garcia-Hamilton forced Plaintiff to agree to the terms of the Last Chance/Abeyance Agreement, including paragraphs 8, 9, and 11 that are facially retaliatory, in order to remain employed by Defendant; and (d) the reinstatement of the removal action on or about July 11, 2013.

117.    Similarly situated employees (e.g., Garcia-Hamilton, Richards, Cardona, Martorana, Purvis, Cruz, Walker, Hernandez, Scott, Bukowski, and Segbefia) not within Plaintiff's protected class were treated more favorably than Plaintiff by Defendant.

**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL**

Specifically, as referenced herein, similarly situated non-Hispanic (Spanish) employees who failed to ensure the SPOT SOP was properly secured in a locked desk or file cabinet and protected from unauthorized access on or about July 8, 2013 (e.g., Garcia-Hamilton, Richards, Cardona, Martorana, Purvis, Cruz, Walker, Hernandez, Scott, Bukowski, and Segbefia), were not similarly disciplined and/or removed from federal service like Plaintiff.

118.    Garcia-Hamilton, Richards, Cardona, Martorana, Purvis, Cruz, Walker, Hernandez, Scott, Bukowski, and Segbefia are proper comparable employees in all material respects because they are all subject to the same TSA policies regardless of position, including but not limited to, TSA Management Directive No. 1100.73-5 (Employee Responsibilities and Conduct): Section 5 -Responsibilities: 5.A.(2) and 5.A.(7); and TSA Management Directive 2810.1 (SSI Program): Section 5 – Responsibilities: 5.A.(1), 5.A.(2), 5.A.(6); and accompanying Handbook Section 5.1 – General Protection of SSI; and 49 CFR Part §1520.9.

119.    There was no legitimate, non-discriminatory reason for the differing treatment between Plaintiff and the similarly situated employees referenced herein.  In fact, Defendant's sustainment of the charge of failure to ensure the SPOT SOP was properly secured in a locked desk or file cabinet and protected from unauthorized access and reasons in support thereof for Plaintiff's removal from federal service are pretextual.

120.    Defendant's discrimination against Plaintiff on the basis of her race (i.e., Hispanic (Spanish) in violation of 42 U.S.C.A. § 2000e-2(a)(1) was a substantial and

motivating reason for unlawful treatment of her as alleged in this complaint including her removal from federal service.

121.   The conduct of Defendant violated the provisions of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), (42 U.S.C. § 2000e et seq.) which constitutes fundamental public policy declaring it to be illegal to discriminate against an employee based upon the employee's race. Defendant's conduct was discriminatory in its disparate treatment of Plaintiff.

122.   As a direct and proximate result of Defendants' violation of 42 U.S.C. § 2000e-2(a)(1), Plaintiff has suffered general and special damages, including lost wages, lost benefits, lost seniority, lost future earnings, lost employment opportunities, emotional distress, anxiety, humiliation, embarrassment, and loss of self-esteem in an amount to be determined at trial. Plaintiff has suffered and will continue to suffer irreparable injury and monetary damages as a result of defendant's discriminatory practices unless the Court grants relief. Therefore, Plaintiff seeks all legal and equitable remedies available at law.

123.   As a further direct and proximate result of Defendant's violation of 42 U.S.C.A. §2000e-2, Plaintiff has been compelled to retain the services of the Law Offices of Edward J. Blum and will continue to incur legal fees and costs. Plaintiff requests that attorney's fees be awarded pursuant to 42 U.S.C.A. § 2000e-5(k) and 29 U.S.C. § 2000e-16(d) where in any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, a reasonable attorney's fee (including expert fees) as part of the costs, and the United States shall be liable for costs the same as a private person.

**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL**

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

1.      This court declare the actions complained of herein to be in violation of Title VII of the Civil Rights Act of 1964, as amended;

2.      An order reinstating Plaintiff to her former position as a TSM, including but not limited to, restoration of seniority, annual and sick leave, and other benefits that she would have received but for her unlawful removal from federal service;

3.      Front pay in lieu of the TSM position if one is not available;

4.      Back pay;

5.      For special or economic damages comprised of past loss earnings and future loss of earnings, in an amount to be proven at the time of trial;

6.      For general or non-economic damages in the form of emotional distress, pain and suffering, humiliation, worry, and stress in an amount to be proven at the time of trial but which in any case shall not exceed $300,000;

7.      Defendant be ordered to take appropriate affirmative acts to ensure that the actions complained of herein are not engaged in again by Defendant or any of his agents;

8.      Defendant, including the officers, director, agents, employees and successors, be permanently enjoined from discriminating or retaliating against any person;

9.      Pre-judgment interest and post-judgment interest;

10.      Actual damages be awarded to Plaintiff and against Defendant;

**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL**

11.     Compensatory damages be awarded to Plaintiff and against Defendant;

12.     Plaintiff be awarded her reasonable attorneys' fees pursuant to 42 U.S.C. §1988 and other federal authorities;

13.     Plaintiff be awarded her costs; and

14.     Plaintiff be awarded all other relief that this Court deems just and proper under the circumstances.

Dated:  January 20, 2021                    _____/s/_____
                                                                    EDWARD J. BLUM


### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

Dated:  January 20, 2021                    _____/s/_____
                                                                    EDWARD J. BLUM